UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYRELL HARRIOTT,

                              Plaintiff,

            – against –

SUCCESS ACADEMY CHARTER
SCHOOLS,

                              Defendant.

**OPINION & ORDER**

22-cv-3037 (ER)

RAMOS, D.J.:

Tyrell Harriott brings this employment discrimination action against his former

employer Success Academy Charter Schools ("Success Academy").  Before the Court is

Success Academy's motion for summary judgment on all claims.  Doc. 19.  For the

reasons set forth below, the motion is granted.

I.      **BACKGROUND**

        **A.  Factual Background**

The following facts are undisputed except where otherwise noted.

Success Academy is a network of 47 charter schools in the New York

metropolitan area.  Doc. 31 (Def.'s Statement of Uncontested Facts and Response to Pl.'s

Counter-Statement of Material Facts)[1] ¶ 1.  Teachers and staff in the Success Academy

---

[1] Local Rule 56.1(a) of the Southern and Eastern Districts of New York requires that parties moving for
summary judgment must also submit "a separate, short and concise statement, in numbered paragraphs, of
the material facts as to which the moving party contends there is no genuine issue to be tried.  Rule 56.1(b)
further requires that "papers opposing a motion for summary judgment shall include a correspondingly
numbered paragraph in the statement of the moving party."  As with the moving party's statement of
material facts, every statement controverting any statement of material fact must be supported by a citation
to admissible evidence.  R. 56.1(d).  Failure to "specifically controvert[]" any paragraph in the moving
party's statement "by a correspondingly numbered paragraph" in the opposing party's statement will result
in the moving party's paragraph "be[ing] deemed to be admitted for purposes of the motion," in that they
are both uncontroverted and admissible.  R. 56.1(c).  These rules—simple to understand and apply—are
designed to assist the Court by narrowing the scope of the issues to be adjudicated and identifying the facts
relevant and admissible to that determination.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Unfortunately, both parties failed to submit a Rule 56.1 Statement in compliance with the local rules.  *See
Emanuel v. Gap, Inc.*, No. 19-cv-03617 (PMH), 2022 U.S. Dist. LEXIS 138156, at *14 (S.D.N.Y. Aug. 3,

---

2022) ("The parties' Rule 56.1 submissions here make a mockery of the primary purpose of the exercise and each of these rules . . . ."); *Heras v. Metro. Learning Inst., Inc.*, No. 19-cv-2694 (DG) (SJB), 2023 U.S. Dist. LEXIS 146692, at *5 (E.D.N.Y. Aug. 18, 2023) (R&R) ("The parties' Rule 56.1 statements are, quite frankly, a complete and total mess, and run afoul of the basic rules governing such submissions . . . .").

Firstly, Harriott, rather than responding to each paragraph in Success Academy's statement by merely controverting the facts therein and then including "*additional* paragraphs containing a *separate*, short and concise statement of additional material facts," instead asserted his additional facts within his responses, all in the same paragraph.  *See* Doc. 26 (Counterstatement of Undisputed Facts).  Consequently, Harriott's response to Success Academy's statement of facts and his counterstatement of facts are effectively one and the same.

Perhaps in response to this anomaly, Success Academy's responsive document also includes *replies* on Harriott's responses to Success Academy's facts, rather than merely a counterstatement of Harriott's additional facts.  *See* Doc. 31.  But "Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts."  *Capital Records, LLC v. Vimeo, LLC*, No. 09-cv-10101 (RA), 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 10, 2018).  "A Reply Rule 56.1 Statement is a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules." *Pape v. Dircksen & Talleyrand Inc.*, 2019 U.S. Dist. LEXIS 17717, at *6 (E.D.N.Y. Feb. 1, 2019) (internal quotation marks and citation omitted), *R&R adopted*, 2019 U.S. Dist. LEXIS 55158 (E.D.N.Y. Mar. 31, 2019).  "As such, the Court declines to consider the Reply Rule 56.1 Statement, except to the extent it respond[s] to the new facts in [Harriott's] Counter Statement of Facts or the evidence cited is contained in the materials provided to the Court, which it has independently reviewed." *See id.*

Moreover, several of Success Academy's responses to Harriott's counterstatements merely "aver" that Harriott or another witness "claims" a fact Harriott cites.  *See, e.g.*, Doc. 31 ¶ 4 (in response to Harriott's assertion that the chess director was involved in decisions to transfer all chess teachers but Harriott, Success Academy "avers [the chess director] Jerald Times claims that he was involved in all chess teacher transfer decisions and was excluded from the decision to transfer [Harriott]").  The local rules provide that failure to specifically controvert an asserted fact with a citation to admissible evidence will result in the asserted fact being deemed admitted.  Local Civ. R. 56.1(c).  It is not enough to satisfy the rule that an opponent merely confirms that a cited document or transcript says what opposing counsel says it says, without specifically denying it and citing to admissible evidence.  *See id.*  Accordingly, where Success Academy failed to properly follow the Rule and controvert Harriott's asserted facts with a citation to admissible evidence, the Court will deem Harriott's statement admitted.  *See Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20-cv-1391 (ER), 2023 U.S. Dist. LEXIS 192634, at *2 n.1 (S.D.N.Y. Oct. 26, 2023).

Finally, in his memorandum of law in support of his opposition, Harriott included *additional* facts that were not included anywhere in his responsive Rule 56.1 statement.  *Compare* Doc. 30 (Pl.'s Opp.) at 6–16, *with* Doc. 26.  That undermines the very purpose of a Rule 56.1 statement, which is to "streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz*, 258 F.3d at 74.  The parties "cannot simply dump . . . [papers] on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain." *Mirza v. Garnet Health*, No. 20-cv-00556, 2022 WL 826410, at *2 n.6 (S.D.N.Y. Mar. 17, 2022) (alteration in original) (citation omitted).

Although the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention, *Holtz*, 258 F.3d at 73, the net result of both parties' deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the instant case to ensure that the claims receive thorough and just consideration.  *See Gittens-Bridges v. City of N.Y.*, No. 22-810, 2023 U.S. App. LEXIS 33872, at *2–3 (2d Cir. Dec. 21, 2023) (noting that the district court, in its discretion, considered a motion for summary judgment on its merits in the interest of "fairness" to the plaintiff, even though the "profound procedural shortcomings in her summary-judgment submissions," which were both procedurally and substantively

network report directly to the leadership at their school (*i.e.*, the principal and assistant principal), who in turn report to "Network" personnel. *Id.* ¶ 3.  As part of the Network structure, teachers and leadership are frequently asked to transfer between school locations within the Network, depending on the needs of particular schools, although Harriott asserts that chess teachers generally had the option to choose whether to transfer. *Id.* ¶ 2.  Success Academy asserts that the school leadership make employment decisions regarding, for instance, coaching and transfer of teachers; but Harriott disputes the contention and asserts that chess directors, in addition to school leadership, were generally heavily involved in the decision to transfer chess teachers.  *Id.* ¶ 4.

Success Academy hired Harriott, an African American man, on August 31, 2015 as a part-time chess instructor[2] at Bedford-Stuyvesant Middle School ("BSMS"), working approximately 60% of a full-time schedule.  *Id.* ¶¶ 5–6.  At the time, Harriott was 37 years old.  Doc. 29-1 (Harriott Dep. Tr.) at 28:22–24.  Harriott reported directly to the BSMS principal (until August 2018, Rishabh Agarwal, and thereafter Michael Battle, who is African American) and assistant principal Rachel Mills, and he was also supervised by chess program leadership and the Network's experiential learning department.  Doc. 31 ¶¶ 3, 7–9.  Harriot asserts that he was hired to develop the chess program at BSMS because it did not then have one.  Doc. 29-1 at 72:20–73:11.  He also asserts that he was one of the oldest, if not the oldest, staff members at BSMS.  *Id.* at 82:22–83:7.

From August 2015 to 2018, Sean O'Hanlon served as the senior manager of the chess program for the Network.  Doc. 31 ¶ 10.  Upon his departure, Success Academy

---

deficient, were reason enough to grant defendant's motion for summary judgment).  In this regard, the Court notes that in several instances, in the interests of justice, recourse was made to facts contained in the admissible evidence submitted by the parties even where both parties failed to include the relevant information in their respective Rule 56.1 submissions.

[2] Harriott asserts that his title was "lead chess teacher," and his responsibilities in that position included teaching classes and chess clubs at the school, training chess club members for tournaments, and taking students to the tournaments.  Doc. 30 at 6 (citing Doc. 29-2 (Morales Dep. Tr.) at 18:3–9, 22:11–23:8).

began searching for a new chess manager, and Harriott applied for the position in November 2018, even though Agarwal had previously told Harriott that he would "not be ready for that position for a couple more years." *Id.* ¶¶ 11–13.  Matthew Morales, who was then a full-time chess instructor and is Latino, also applied for the role and was ultimately selected for the promotion. *Id.* ¶¶ 12, 17.  Morales had begun working at Success Academy in September 2012 as a chess associate teacher and had since been promoted to lead teacher and then to labsite lead.[3] *Id.* ¶ 14.  During the months between O'Hanlon's departure and Morales' appointment, Morales had also served as the acting chess manager. *Id.* ¶ 16.  Harriott alleges that Morales obtained a copy of his application and mocked it during a video call.  Doc. 29-1 at 101:16–102:15.

In January 2019, Success Academy hired Jerald Times as the new chess director, overseeing the entire chess program and supervising Morales as chess manager.  Doc. 31 ¶ 18.  Times is African American. *Id.*

Upon Morales' promotion, Harriott and two of his colleagues, Alexander Beltre (who is Latino) and Christopher Johnson (who is African American), applied to take over the labsite lead role for the 2019–2020 school year. *Id.* ¶¶ 19–21.  Harriott testified at his deposition that Principal Battle recommended that he apply for the role and that Beltre only applied for the role, after the application deadline, at Morales' urging, but Beltre said that he believed Harriott would be a better fit for the position. *Id.* ¶¶ 19–20.  Harriott additionally testified that Morales had told him he would not appoint a part-time teacher to the labsite lead position.[4] *Id.* ¶ 23.  Beltre and Johnson were also part-time teachers at the time. *Id.*; Doc. 29-2 at 23:15–20.

---

[3] A labsite lead served as a model teacher and supervisor for all chess coaches for a particular school level (*e.g.*, middle school) and also hosted teachers in his classroom to observe higher level chess teaching.  Doc. 29-1 at 94:18–95:11; Doc. 29-2 at 18:22–19:9; Doc. 29-3 (Battle Dep. Tr.) at 32:5–17.

[4] It is not clear from the parties' submissions whether Morales meant that part-time teachers were not *eligible* for the position, or whether Morales simply did not *want* to appoint a part-time teacher and therefore refused to do it.  Harriott, however, submitted a copy of Success Academy's position statement

As part of the application process, Harriott, Beltre, and Johnson submitted written applications and videos of them teaching a class.  Doc. 31 ¶ 22.  For reasons neither party explains, Beltre's application form contained two additional questions[5] not included on Harriott or Johnson's.  *Id.* ¶ 21.  The written portion of the application asked the candidates to state why they were interested in the position.  *Id.* ¶ 23.  Beltre stated that he wanted Success Academy's chess program to achieve national recognition and wanted to help make lessons more student-centered.  *Id.*  Johnson stated that he wished to help grow other teachers' "teaching practice" and expand on his leadership abilities.  *Id.*  And Harriott stated that he was already "the primary model" for middle school chess teachers and wanted the pay increase that came with the promotion.  *Id.*  Chess Director Times recommended Beltre and Johnson, both of whom were thereafter appointed labsite leads. *Id.* ¶ 24.  Harriott testified that Times told him he thought Harriott was the superior candidate, but Morales would not consider promoting Harriott.  *Id*.

At the time of his recommendation, Times had been working with Success Academy for two weeks and had not yet reviewed the candidates' performance metrics. *Id.*  Harriott attributes Times' decision not to recommend him to Morales' failure to inform Times that Harriott had been given a Teacher Excellence Award, had implemented new technologies to improve the student experience that other teachers then adopted, and that his students were highest rated across several metrics.  *Id.*  Success Academy argues that these assertions are contradicted by contemporaneous evidence in the record that

---

before the EEOC regarding Harriott's discrimination charges, in which Success Academy wrote that Morales did not believe Harriott would be the best choice for the labsite lead position in part because Harriott had a part-time schedule that he "was protective of," and Morales had concerns about Harriott's "ability to complete all necessary teacher and [l]absite [l]ead responsibilities given his limited schedule." Doc. 29-5 at 5–6.

[5] The two questions asked (1) what best practices Beltre demonstrated in his video submission and how that contributed to his scholars' success in the classroom, and (2) what he would change about the teaching in the moments captured on the video if he could revisit the lesson.  *Compare* Doc. 22-8 (Harriott Labsite Lead Application) *and* Doc. 22-10 (Johnson Labsite Lead Application), *with* Doc. 22-9 (Beltre Labsite Lead Application).

Times was aware of these achievements when deciding whom to recommend.  *Id.*
Moreover, while Harriott asserts that Times later informed Success Academy's human
resources partner, Natalie Allen, in October 2019 that Harriott ought to have been
promoted, Success Academy states that Harriott told Allen that Beltre and Johnson were
"well chosen" for the position.  *Id.*  After not getting the labsite lead position in the 2019–
2020 school year, Harriott did not apply for the position again for any other school year.
*Id.* ¶ 25.

Around this same time, Harriott asserts that he recommended three people for
chess coach positions:  Alex Figueroa (who is Hispanic), Ernest Colding (who is African
American), and Jeremiah Smith (who is African American).  Doc. 29-1 at 206:15–212:11;
Doc. 30 at 11.  He further asserts that neither Colding nor Smith were hired by Success
Academy but that Figueroa was hired even though he "bombed" his interview and was
given a second opportunity to interview.  *Id.*  While Success Academy was still deciding
who to appoint as labsite leads and chess coaches, Harriott complained to Battle in March
2019 that Morales was "a little racist."  *Id.* at 195:3–20, 264:16–266:15; Doc. 31 ¶ 30.
His concerns were based on the fact that he did not receive the labsite lead position, but
Beltre was particularly invited to apply to the position, and that the two African American
chess coaches he recommended were not hired, but Figueroa was given a second chance
to interview.  Doc. 30 at 11–12.

On October 15, 2019, Success Academy received a complaint from the director of
programs of Chess in the Schools ("CIS"), a third-party organization that hosts chess
tournaments attended by New York City schools, including Success Academy, that
Harriott and a BSMS chaperone engaged in an inappropriate verbal altercation with a
college-bound CIS representative.[6]  Doc. 31 ¶¶ 26–27.  As a result, CIS banned BSMS

---

[6] Harriott disputes the CIS director's characterization of the incident, stating that it was not "inappropriate,"
and the BSMS parent involved was not acting as a chaperone at the time.  *Id.* ¶ 27.

from participating in tournaments for the rest of the year.  *Id.* ¶ 28.  Battle verbally

counseled Harriott about the incident but issued no formal disciplinary action.  *Id.* ¶ 29.

Two days later, on October 17, 2019, Harriott submitted an internal complaint to

Success Academy's human resources department that Morales had engaged in "racial

discrimination, bullying and harassment," including in the selection of his "friends" for

the labsite lead position the prior school year.  *Id.* ¶ 30.  Allen scheduled a meeting with

Harriott and Times to discuss Harriott's allegations.  *Id.* ¶ 31.  During the meeting,

Harriot accused Battle of being "in cahoots" with Morales, which was why Harriott had

not reported his concerns directly to Battle.  *Id.* ¶ 32.  Allen thereafter investigated

Harriott's allegations and, as part of the investigation, met separately with Harriott,

Times, Battle, and Mills; the parties dispute whether Allen also met with Morales.  *Id.*

¶ 33.  In those meetings, Times described Harriott as "a bit abrasive with peers,"[7] and

Battle said that Morales told him Harriott was not "a model teacher."  *Id.* ¶ 34; Doc. 22-

14 (Allen's Notes from the Investigation) at 4.  In response to Harriott's complaint, Times

also told Heather Haley, Success Academy's experiential learning program director, that

there were "other incidents" he needed to address with her regarding Morales' "bullying

behavior that have been detrimental to our program."  Doc. 22-13 (Oct. 20, 2019 Times

Email to Haley) at 2.  On October 30, 2019, Allen concluded her investigation and met

with Harriott to explain that she was unable to substantiate his claims against Morales.

Doc. 31 ¶ 36.

The same week that Harriott made the complaint to Allen, Harriott asserts that he

also complained about Morales' discriminatory conduct to Darren Sam, who was a

member of Success Academy's management[8] and was then in his late 20s or early 30s.

---

[7] In a subsequent post-discovery affidavit submitted in support of Harriott, Times acknowledged that he described Harriott as abrasive, but noted:  "While being candid, I did not see that [*i.e.*, Harriott's abrasiveness] as an issue as many people at Success, including Morales and [Heather] Haley [Success Academy's experiential learning program director], are abrasive with their co-workers."  Doc. 28 ¶ 12.

[8] Harriott does not state what Sam's exact title or position at Success Academy was.

Doc. 29-1 at 82:16–84:21, 263:6–264:10, 272:6–8.  Harriott testified that Sam said he did

not "feel comfortable talking to [Harriott] like this, [Harriott] being an older gentleman

and all."  *Id.* at 270:23–271:16.  He further testified that, in response to the complaint

against Morales, Sam threatened to have Harriott transferred to another location.  *Id.* at

82:16–84:21.  Harriott also testified, however, that he never directly told Sam about the

formal complaint against Morales.  *Id.* at 375:17–376:2.  Harriott also stated that Sam

"[m]entioned the N-word towards" him.  *Id.* at 83:20–84:9.

Although Harriott did not apply to be labsite lead for the 2020–2021 school year

(Doc. 31 ¶¶ 25), approximately three months later, on January 10, 2020, Times emailed

Allen for advice regarding Harriott's continued interest in a Network-level role within the

chess program:

> Natalie,
>
> I am reaching out to you because I need your advice regarding Tyrell
> Harriot.  As you know Tyrell filed a complaint with HR late last year
> regarding harassment.  I know he very much wants to apply for the
> content lead or labsite position.  From my understanding, Tyrell has
> some pluses that would benefit our program but might find it difficult
> to navigate a few relationships with his peers.
>
> His performance metrics are pretty high[.]
> He has strong chess skills.
> He has excellent tech skills.
> His school has the number two rated team in the network.
> He introduced google classroom to the staff.
>
> His question mark is that he can be socially awkward with his peers.
> I know the teacher lead is a pain point for Tyrell but I need a broader
> perspective before I write any recommendations for him.
>
> Your thoughts are appreciated.

Doc. 22-15 (Times Email to Allen) at 3.  Success Academy characterizes Times' email as

raising a concern regarding Harriott's qualification for a leadership position.  *See* Doc. 31

¶¶ 37–38.  Harriott, however, points to the affidavit Times submitted in support of

Harriott's opposition to summary judgment:

> Regarding my January 10, 2020, email cited by Success, some con-
> text is important.  I still believe that Harriott's performance strongly

> warranted a promotion.  I was aware of an issue that Harriott had
> previously declined to participate in a teach-back session and was
> aware that this could hurt him in the selection process.  If I believed
> that there was a serious issue or one that truly warranted not select-
> ing Harriott, I would not have contacted Allen even to discuss this
> matter but simply would not have taken any action to promote him
> since, as detailed above, Morales was against Harriott's promotion
> to the point of withholding information from me.

Doc. 28 ¶ 13.  Success Academy asserts that Times ultimately did not recommend[9]

Harriott for a labsite lead role for the 2020–2021 school year and instead recommended

Beltre, Alejandro Montalvo (who is Latino), Dakim Vanterpool (who is African

American), and Robert Leonard (who is Caucasian), each of whom was then appointed to

the role.  Doc. 31 ¶ 39.  The parties do not dispute, however, that Harriott had not applied

for the position.  *Id.* ¶ 25.

In spring 2020, Success Academy began restructuring its experiential learning

department to standardize its teaching models across each of its schools.  *Id.* ¶ 40.  As

part of that restructuring, Success Academy determined that only one full-time chess

instructor was needed at BSMS for the following school year.  *Id.* ¶ 41.  Accordingly,

either Harriott, who was then working approximately 85% of a full-time schedule, or

BSMS' full-time chess instructor, Nile Smith, would be transferred to another school.  *Id.*

¶¶ 42–43.  Success Academy asserts that Battle made the decision, whereas Harriott

asserts that Battle and Morales both were consulted.  *Id.*  The instructor asked to transfer

would be assigned to Queens 1 Middle School  ("Queens 1") to start Success Academy's

first middle school chess program in Queens.  *Id.* ¶ 44.

Ultimately, Battle selected Harriott to transfer to Queens because:  (1) Harriott

lived in Queens, while Smith lived closer to BSMS; (2) Harriott had experience building

a chess program, making him more suited for the Queens opportunity; and (3) Smith's

schedule better fit BSMS' needs.  *Id.* ¶ 45.  Battle informed Harriott of the decision on

---

[9] Times states he was excluded from the labsite lead selection process and not asked for recommendations.
Doc. 28 ¶ 14.

May 5, 2020.  *Id.* ¶ 46.  Harriott told Battle he could not work at Queens 1 because he had attended the school as a child and experienced numerous issues, including having been physically attacked, and he had "made a promise to God" that, if he was able to leave the school, he would never go back.  *Id.* ¶ 47.  Two weeks later, on May 19, 2020, Battle gave Harriott the opportunity to transfer to another middle school in Queens instead, Far Rockaway Middle School ("Far Rockaway").  *Id.* ¶ 48.  Harriott also refused to transfer to Far Rockaway, both because it was too far from the Marshall Chess Club, a third-party club where he participated in chess tournaments, and because he would have had to switch to a full-time schedule, which meant that he would not be able to participate in the Marshall Chess Club tournaments.  *Id.* ¶ 49.  Instead, Harriott asked to either stay at BSMS, be transferred to Success Academy's Hollis, Queens, location, or be granted an indefinite leave of absence until a position because available at Hollis.  *Id.* ¶ 50.  Battle explained that transferring to Hollis was not an option, and gave Harriott until May 28, 2020 to decide whether to transfer or terminate his employment with Success Academy. *Id.* ¶ 51.  When Battle asked Harriott for his decision on May 28, Harriott again refused to transfer to either school, and Battle advised Harriott that his employment with Success Academy would end June 19, 2020.  *Id.* ¶¶ 52–53.  Harriott asserts that he was the only senior middle school chess coach forced to transfer.  Doc. 28 ¶ 20.

### B.  Procedural History

Harriott filed the instant suit on April 12, 2022 alleging that Success Academy failed to promote him on the basis of his race and age and it later retaliated against him when he complained about discriminatory treatment.  Doc. 1.  Success Academy answered on June 14, 2022.  Doc. 10.  The case was referred to mediation (Doc. 11), which ultimately proved unsuccessful (Doc. 12), and so proceeded to discovery, which closed on April 28, 2023 (Doc. 15).

Success Academy requested leave to move for summary judgment on April 26, 2023.  Doc. 16.  At the premotion conference held on May 4, 2023, Harriott represented

that he was withdrawing his claims for discrimination on the basis of age.  Success Academy filed the instant motion for summary judgment on June 1, 2023.  Doc. 19.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (stating courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions" (citation omitted)).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials— apply no less to discrimination cases."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137.  Courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III.   DISCUSSION

Success Academy seeks to dismiss all of Harriott's claims for race discrimination and retaliation pursuant to the Civil Rights Act of 1871 (as amended 42 U.S.C § 1981), the New York State Human Rights Law, § 296, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, § 8-107 ("NYCHRL").  *See* Doc. 5 (Compl.); Doc. 20 (Mem. of Law in support of Def.'s Mot. for Summ. J.).

**A. The Court Grants Success Academy's Motion for Summary Judgment as to Harriott's Discrimination Claims**

1. *Summary Judgment is Granted on Harriott's Claims of Discrimination Based on § 1981 and the NYSHRL*

    a. *The McDonnell Douglas Framework*

Harriott's race discrimination claims under § 1981 and the NYSHRL are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Asiedu v. Broadreach Med. Res.*, 19-cv-11825 (ER), 2022 U.S. Dist. LEXIS 165568, at *26 (S.D.N.Y. Sep. 13, 2022). Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination must first demonstrate a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To prove a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (citing *Holcomb*, 521 F.3d at 138). A failure to promote may constitute an adverse employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). To make out a failure to promote or hire claim, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a job for which his employer was seeking applicants; (3) he was rejected despite being qualified; and (4) after this rejection, the position remained open and his employer continued to seek applicants with his qualifications. *Hollington v. CDM Fed. Programs Corp.*, No. 22-cv-4940 (ER), 2023 U.S. Dist. LEXIS 40887, at *18 (S.D.N.Y. Mar. 10, 2023) (citing *Hughes v. Twenty-First Cent. Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018)). With respect to the third prong, the Second Circuit has held that a plaintiff must prove that he was "rejected under circumstances which give rise to an inference of unlawful discrimination." *Aulicino v. N.Y.C. Dep't. of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (citation omitted).

The Second Circuit has explained that a plaintiff's burden at this stage is de minimis. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). Nonetheless, in order to state a prima facie case for discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002), and "cannot meet its burden through reliance on unsupported assertions," *Goenaga*, 51 F.3d at 18. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 451–52 (2d Cir. 1999)). "A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge," is also insufficient. *Fincher v. Depository Trust & Clearing Corp.*, No. 06-cv-9959 (WP), 2008 U.S. Dist. LEXIS 70046, at *8 (S.D.N.Y. Sep. 17, 2008).

If a plaintiff successfully presents a prima facie case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action. *Abdu-Brisson*, 239 F.3d at 468–69 (citations omitted). "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). To satisfy the second step of *McDonnell Douglas*, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "If the defendant carries this burden

of production, the presumption [of discrimination] raised by the prima facie case is rebutted," and "drops from the case." *Id.* at 255, 255 n.10.

At the third step, the plaintiff must then "establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *James v. Pernod Ricard USA, LLC*, No. 21-cv-10795 (DLC), 2023 U.S. Dist. LEXIS 65415, at *11 (S.D.N.Y. Apr. 13, 2023) (citation omitted).  "Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (collecting cases).  But the Second Circuit has cautioned:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'

*Id.* (citation omitted).

### b.  Harriott Cannot Plead a Prima Facie Case of Discrimination

Harriott alleges that he was discriminated against because he is African American when Success Academy failed to promote him to labsite lead for the 2019–2020 school year. [10]  Doc. 30 at 22.  Success Academy challenges that it promoted several African American employees to the labsite lead role, including Vanterpool and Johnson, and promoted Times to chess director, an even higher-level position than labsite lead.  Doc.

---

[10] In its opening motion for summary judgment, Success Academy argues that Harriott also cannot raise a discrimination claim on the basis of Success Academy's choice to promote Morales, instead of Harriott, to the chess manager position in 2018.  Doc. 20 at 14–15.  But, in his opposition, Harriott makes no arguments concerning the failure to promote him over Morales as chess manager.  *See* Doc. 30.  Nor does his complaint (Doc. 5) or premotion response letter (Doc. 18) specify that Harriott sought to bring a discrimination claim on the basis of the chess manager appointment.  Doc.

20 at 15–18.  It therefore argues Harriott could not have been treated less well because of his race if he was passed over for promotion for another member of his protected class. *Id.* at 16–17 (citing *Rodriguez v. N.Y.C. Health & Hosps. Corp.*, No. 14-cv-4960 (BMC), 2015 U.S. Dist. LEXIS 119040, at *14 (E.D.N.Y. Sept. 8, 2015)).  Moreover, to the extent that Harriott argues that Morales promoted his "friends" to the labsite lead position, Success Academy argues that nepotism is not actionable as an employment discrimination claim.  *Id.* at 17.  Both arguments challenge Harriott's ability to state a prime facie case for discrimination—namely, the requirement that Harriott prove he was "rejected under circumstances which give rise to an inference of unlawful discrimination."  *Aulicino*, 580 F.3d at 80 (citation omitted).

Harriott does not respond to either of Success Academy's arguments.  Doc. 30 at 20–24.  He instead advances alternate bases upon which the Court should find that Morales discriminatorily "singled out and refused to promote Harriott."  *Id.* at 22. Specifically, Harriott notes that Morales:

- told Battle that Harriott was not a model teacher;
- falsely told Harriott that part-time teachers were not eligible to be promoted to labsite lead (even as he promoted Beltre, who was also part-time);
- failed to disclose Harriott's accomplishments to Times when Times was evaluating labsite lead candidates;
- gave Beltre an application that differed from those of other applicants; and
- made special accommodations for Beltre at Harriott's expense by letting Beltre apply after the application deadline.

*Id.* at 22–24.  Harriott does not address the fact that Johnson, who is African American, was appointed labsite lead *alongside* Beltre, except to say that Success Academy errs in focusing on any appointment other than Beltre's.  *See id.* at 23 ("While Success Academy focuses on the promotions of Johnson and Va[n]terpool, the promotion of Beltre evidences [Success Academy's] discriminatory intent.").

16

Although there is no *per se* rule in the Second Circuit preventing a plaintiff from establishing a prima facie case of discrimination when the employer gave his job to another remember of his protected class, courts routinely hold that it is "extremely difficult, if not practically impossible," for plaintiffs to establish a prima facie case in such circumstances. *See Inguanzo v. Hous. & Servs., Inc.*, No. 12-cv-8212 (ER), 2014 U.S. Dist. LEXIS 132197, at *56–58 (S.D.N.Y. Sept. 19, 2014) (citation omitted) (collecting cases); *see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) (collecting additional cases); *Rodriguez*, 2015 U.S. Dist. LEXIS 119040, at *14–15. Harriott's failure to address this body of law at all is fatal to his claim. During the 2019–2020 school year for which Harriott applied for the labsite lead role and was passed over, Success Academy instead appointed Johnson, who is African American. Doc. 31 ¶¶ 19–21, 24. Moreover, for the following school year, Success Academy appointed Vanterpool, who is also African American, to the labsite lead position. *Id.* ¶ 39. Although in both instances Success Academy also appointed at least one other candidate who was not African American, that does not support Harriott's claim of discrimination based on his race. Moreover, it is undisputed that Success Academy has African American employees in higher-ranking positions, including Battle (BSMS principal) and Times (Network chess director). Doc. 31 ¶¶ 8, 18. Harriott's claim "is therefore [further] weakened by such evidence." *See Inguanzo,* 2014 U.S. Dist. LEXIS 132197, at *56 (collecting cases).

Even if the Court were to disregard Success Academy's promotion of other members of Harriott's protected class and the corresponding case law, however, Harriott's proffered evidence of discriminatory intent would nonetheless fail because it is largely inadmissible.[11] A nonmoving party must come forward with *admissible* evidence to avoid summary judgment. *Saenger*, 706 F. Supp. 2d at 504; *see also Debrosse v. City of*

---

[11] Neither party makes any arguments regarding hearsay and the admissibility of Harriott's proffered evidence.

*New York*, 739 F. App'x 48, 50 (2d Cir. 2018) ("Nor does any of the inadmissible hearsay deposition testimony . . . defeat summary judgment, since the court may consider 'only admissible evidence.'" (citation omitted)); *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)), *aff'd sub nom. Abdel-Karim v. Egyptair Holding Co.*, 649 F. App'x 5 (2d Cir. 2016). Inadmissible hearsay is not enough. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (collecting cases in which courts disregarded improper averments, hearsay, statements not based on personal knowledge, and assertions contradicted by admissible evidence in the record).

The first category of evidence to which Harriott points the Court is that during the investigation into Harriott's accusations against Morales, Allen interviewed Battle, who told her that Morales told him Harriot "wasn't a model teacher," as memorialized in Allen's notes. Doc. 22-14 at 4. Federal Rule of Evidence 805 requires that each element of the hearsay within hearsay be admissible. Here, there are three levels of statements, each of which require an exception: (1) Morales' statement to Battle, as repeated in (2) Battle's comments to Allen, as memorialized in (3) Allen's notes. Allen's notes are admissible because courts regularly admit human resources investigators' notes as business records under Federal Rule of Evidence 803(6)(B). *See Mendez-Nouel v. Gucci Am., Inc.*, 10-cv-3388 (PAE), 2012 U.S. Dist. LEXIS 160530, at *8–9 n.4 (S.D.N.Y. Nov. 8, 2012). Moreover, Morales' statement that Harriot "wasn't a model teacher" is not offered for the truth of the matter asserted (that Harriot was a poor teacher) but for the fact that Morales said it and its effect on Battle's consideration of Harriott's candidacy. A "statement offered to show its effect on the listener is not hearsay." *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (citation omitted). It too is therefore admissible. But Battle's repetition of Morales' statement to Allen *is* being offered for the

truth of the matter asserted in Battle's statement (that Morales said it).  *See Zoulas v. N.Y.C. Dep't of Educ.,* No. 18-cv-2718 (GHW), 2021 U.S. Dist. LEXIS 166045, at *55 (S.D.N.Y. Sep. 1, 2021) (". . . [S]econdhand testimony is inadmissible hearsay."). Accordingly, the statement would be admissible only if it constitutes a statement made by Battle as Success Academy's employee or agent on a matter within the scope of that relationship and while it existed.  *See* Fed. R. Evid. 801(d)(2)(D).  As principal, Battle was undoubtedly Success Academy's employee at the time of the statement (Doc. 31 ¶ 8), but it is not clear that Battle's comments to Allen were within the scope of his employment.  A declarant's statement will be within the scope of his employment if he is "an advisor or other significant participant in the decision-making process that is the subject matter of the statement."  *Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005 U.S. Dist. LEXIS 1672, at *38 (S.D.N.Y. Feb. 2, 2005) (quoting *Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002)).  But there is no evidence in the record that Battle had any involvement in the human resources investigation into Morales' conduct except as an interviewee.  That is a far cry from the level of involvement necessary for Rule 801(d)(2)(D).  *See id.*  Moreover, although Battle and Morales were both deposed, neither were asked about or otherwise testified regarding this alleged statement, meaning that there is no other evidence upon which Harriott can rely to show that alternate admissible evidence will be available at trial.  Accordingly, the middle of the three levels of hearsay is inadmissible, rendering the entirety inadmissible pursuant to Rule 805, and the Court may not consider the statement as proof of discriminatory motive.

Second, Harriott points to Morales' statement to him that part-time teachers were not eligible for the labsite lead role.  Because Harriott offers it for the truth of the matter asserted (that part-time teachers were not eligible), it would ordinarily be inadmissible hearsay unless an exception applies.  *See* Fed. R. Evid. 802.  The only potentially plausible exception is that of Rule 801(d)(2)(D).  There is conflicting evidence in the

record as to whether Morales participated in the labsite lead promotion decision.  On the one hand, the parties appear to agree that *Times* was the one who made the official recommendation on behalf of the chess program both for the 2019–2020 and 2020–2021 school years.  Doc. 31 ¶¶ 24, 39.  On the other, in its position statement before the EEOC, Success Academy stated that Haley specifically asked Morales for his opinion on Harriott's candidacy, and Morales stated that he "had concerns about [] Harriott's ability to complete all necessary teacher and [l]absite [l]ead responsibilities given his limited schedule," which Haley stated that Harriott "was protective of, as it allowed him to both teach and coach chess [] as well as compete himself." Doc. 29-5 at 5–6.  Arguably, this may render Morales's statement "within the scope of his employment" for purposes of Rule 802(d)(2)(D), and the Court will consider it.

Harriott's remaining three pieces of evidence—Morales' failure to disclose Harriott's accomplishments to Times, that Morales gave Beltre an application with two additional questions, and that Morales let Beltre apply after the deadline—are not statements and therefore do not fall within the definition of hearsay.  *See* Fed. R. Evid. 801(a), 801(c).  Even taken with Morales' and Haley's concerns regarding Harriott's part-time schedule, this evidence is not enough, however, to overcome the "practically impossible" hurdle of stating a prima facie case of discrimination where he was passed over for promotion in favor of other members of his protected class.  *See Inguanzo*, 2014 U.S. Dist. LEXIS 132197, at *56–58.

Indeed, even if the Court *were* to consider Morales' statement that Harriott was not a model teacher, it would still be insufficient to resist summary judgment.  The Court is not persuaded that, even with that evidence, Harriott could overcome the practically impossible hurdle to state a prima facie case of discrimination on the first step of the *McDonnell Douglas* framework.  But, even if he could, Harriott could not satisfy the third step of the framework to show by a preponderance of the evidence that Success Academy's actions were a pretext for discrimination in light of Success Academy's

proffered explanation that Harriott was not promoted to higher positions because he was abrasive and had difficulty navigating relationships with his colleagues, as even Times repeatedly stated.  Thus, the Court grants Success Academy's motion for summary judgment on Harriott's § 1981 and NYSHRL claims for discrimination.

    *2.   Summary Judgment is Granted on Harriott's Claims of Discrimination Based on the NYCHRL*

    The NYCHRL was "designed to be 'broader and more remedial' than" federal and state anti-discrimination laws.  *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012).  Accordingly, although claims brought under the NYCHRL are analyzed using the same *McDonnell Douglas* framework as § 1981 and NYSHRL claims, they "must be reviewed independently from and more liberally than their federal and state counterparts." *James*, 2023 U.S. Dist. LEXIS 65415, at *12 (citations omitted).  To defeat summary judgment on an NYCHRL claim, a plaintiff "need only show that her employer treated her less well, at least in part for a discriminatory reason." *Bright-Asante v. Saks & Co.*, No. 15-cv-5876 (ER), 2020 U.S. Dist. LEXIS 47354, at *14 (S.D.N.Y. Mar. 18, 2020).  "Nonetheless, district courts must be mindful that the NYCHRL is not a general civility code," and the plaintiff must still bear "the burden of showing that the conduct is caused by a discriminatory motive." *James*, 2023 U.S. Dist. LEXIS 65415, at *12 (citation omitted).  For the purposes of NYCHRL, "a discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that . . . comparators were treated better than the plaintiff was." *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-cv-4558 (JMF), 2021 U.S. Dist. LEXIS 216011, at *14 (S.D.N.Y. Nov. 8, 2021) (alteration in original) (citation omitted).  Even under this more lenient standard, summary judgment in favor of the employer may still be appropriate if there is no evidence of discriminatory motive before the Court.  *See Diagne v. N.Y. Life Ins. Co.*, No. 09-cv-5157 (GBD), 2011 U.S. Dist. LEXIS 6037, at *6–8 (S.D.N.Y. Jan. 21,

2011); *see also Krow v. Pinebridge Invs. Holdings U.S. LLC*, No. 19-cv-5711 (ER), 2022 U.S. Dist. LEXIS 50239, at *40–41 (S.D.N.Y. Mar. 21, 2022); *Bright-Asante*, 2020 U.S. Dist. LEXIS 47354, at *14.

Just as with his federal and state claims, Harriott's evidence in support of his NYCHRL claim similarly fails show discriminatory motive.  He was passed over for promotion to labsite lead in favor of Johnson, Success Academy also hired Vanterpool as labsite lead the following year, and both Times and Battle serve in higher-ranking positions than labsite lead.  *See* Doc. 20 at 16–18.  Johnson, Vanterpool, Times, and Battle are all African American.  This is near-fatal even under the NYCHRL.  *Szewczyk v. City of N.Y.*, No. 15-cv-918 (MKB), 2016 U.S. Dist. LEXIS 91856, at *33 (E.D.N.Y. July 14, 2016) (citing *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 239 (E.D.N.Y. 2015)).  And Harriott's limited admissible evidence is insufficient to satisfy his burden to show discriminatory motive.  Consequently, the Court also grants Success Academy's motion for summary judgment as to Harriott's NYCHRL claim for discrimination.

**B.  The Court Grants Success Academy's Motion for Summary Judgment as to Harriott's Retaliation Claims**

Retaliation claims are also properly analyzed under the three-step *McDonnell Douglas* burden-shifting framework under which Harriott must first establish a prima facie case of discrimination; at which point the burden shifts to Success Academy to offer a legitimate, nondiscriminatory reason for its actions; and then back to Harriott to demonstrate that the proffered reason is pretextual.  *See Taylor v. Seamen's Soc'y for Children*, No. 12-cv-3713 (PAE), 2013 U.S. Dist. LEXIS 176914, at *55, 63 (S.D.N.Y. Dec. 16, 2013).  To state a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001).

The parties concede that Harriott's October 2019 internal complaint that Morales had engaged in racial discrimination, bullying and harassment constituted protected activity.  Success Academy disputes, however, that Harriott can establish a prima facie case of retaliation because his proposed transfer to Queens did not constitute an adverse action, and there is no causal link between Harriott's complaint and the proposed transfer seven months later.  Doc. 20 at 18–21.  Further, Success Academy argues that, even if Harriott were to satisfy the first step of the *McDonnell Douglas* framework, at the third step, he would be unable to show that Success Academy's legitimate, nondiscriminatory reasons were pretextual.  *Id.* at 21–22.

### 1. *The Proposed Transfer to Queens was Not an Adverse Action Under § 1981, the NYSHRL, or the NYCHRL*

Under § 1981 and the NYSHRL, an adverse employment action is a "materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  A transfer constitutes an adverse employment action if it results in "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78–80 (2d Cir. 2008).  Courts have found transfers have a materially adverse change if the employee (1) has the same job responsibilities and compensation but an increase in workload and stress, (2) different or more cumbersome job responsibilities so significant "as to constitute a setback to [his] career," (3) is no longer eligible for promotion opportunities or is working in a less prestigious unit or department, (4) experiences a net loss in salary, or (5) is transferred to a department with objectively less favorable conditions. *Jennings v. City of N.Y.*, No. 22-cv-1885 (GHW) (SLC), 2023 U.S. Dist. LEXIS 35325, at *34–35 (S.D.N.Y. Jan. 26, 2023) (R&R) (collecting cases), *R&R adopted in relevant part* 2023 U.S. Dist. LEXIS 34317 (Mar. 1, 2023).

The elements of a prima facie case of retaliation under the NYCHRL are "identical" to its state and federal counterparts, except that the NYCHRL employs a

broader standard for an "adverse employment action." *Smith v. City of New York*, 385 F.
Supp. 3d 323, 345-46 (S.D.N.Y. 2019). The NYCHRL does not require that the
retaliation "result in an ultimate action with respect to employment . . . or in a materially
adverse change in the terms or conditions of employment." *Jennings*, 2023 U.S. Dist.
LEXIS 35325, at *48 (alteration in original) (citation omitted). Rather, it need only "be
reasonably likely to deter a person from engaging in protected activity." *Id.* (citation
omitted). Even under the broader requirements of the NYCHRL, however, "petty slights
or minor annoyances" are not enough. *Lott v. CoreOne Techs., LLC*, No. 14-cv-5848
(CM), 2016 WL 462486, at *15 (S.D.N.Y. Feb. 2, 2016).

Success Academy argues that, even under the more generous NYCHRL standard,
transferring Harriott—either to Queens 1 or, when Harriott refused that, then Far
Rockaway—was not an adverse employment action; specifically, it argues that being
transferred to another school to start a new chess program, even with a different commute
time, would not deter a person from engaging in protected activity. Doc. 20 at 18–20. In
response, Harriott conclusorily argues, without any citations to the record or the law,[12]
that both proposed transfers were adverse employment actions because (1) "he suffered a
traumatic experience" at Queens 1 and (2) moving to Far Rockaway would require that
he be full-time, which, with the added longer commute, would interfere with his Marshall
Chess Club tournaments. Doc. 30 at 25–26.

Had Success Academy forced Harriott to transfer to Queens 1, even knowing of
his "traumatic experience there," it arguably could have constituted an adverse
employment action. *See Jennings*, 2023 U.S. Dist. LEXIS 35325, at *35 (noting that
denial of a transfer request from an "objectively unfavorable" work environment could
constitute an adverse employment action). But Success Academy responded to Harriott's
objection by offering him a transfer to another school—and changing from an 85%

---

[12] It is worth noting that this alone is reason enough to reject Harriott's arguments.

schedule to a full-time schedule, even with a longer commute, does not constitute an adverse employment action.  *See Craven v. City of N.Y.*, No. 20-cv-8464 (ER), 2022 U.S. Dist. LEXIS 133674, at *19–20 (S.D.N.Y. July 27, 2022) (noting that a transfer with an increased commute time is not necessarily enough to dissuade a reasonable employee in his position from complaining of unlawful discrimination and collecting cases).  Thus, Harriott cannot show that he suffered an adverse employment action, meaning that he cannot prove a prima facie case of discrimination.  As this fails the first step of the *McDonnell Douglas* framework, this is an independent reason for the Court to grant Success Academy's motion for summary judgment on Harriott's retaliation claims.

     *2.  There is No Causal Link Between Harriott's Complaint Against Morales and the Proposed Transfer*

Second, Success Academy argues that Harriott cannot show that the May 2020 transfer was causally connected to his October 2019 complaint against Morales, as seven months passed between the actions, and it was Battle, not Morales, who made the decision to transfer Harriott.  Doc. 20 at 20–21.

Harriott concedes that seven months is "not short enough on its own" to establish a causal connection but argues that Success Academy's other actions regarding the transfer "establish[] that [Success Academy's] motive was retaliatory."  Doc. 30 at 28. Specifically, he argues that Battle only "weigh[ed] in" on the decision to transfer him, but someone else put in Harriott's name for a potential transfer.  *Id.* at 28–29.  He also contradictorily argues that Morales and Times determined the transfer, but that Times was excluded from the decision because Times objected to it.  *Id.*  He also notes that Sam threatened to transfer him when he reported the complaint against Morales.  *Id.*

On reply, Success Academy reiterates that (1) the evidence in the record makes clear that Battle alone decided whether to transfer Smith or Harriott, (2) Times' exclusion creates no evidence of discriminatory or retaliatory motives since Morales was also excluded from the decision to transfer Harriott in the restructuring, and (3) there is no

evidence that Sam was aware of Harriott's formal internal complaint about Morales, nor that Sam was involved in the decision to transfer Harriott.  Doc. 32 at 13–14.

"A plaintiff may establish causal connection directly, through evidence of retaliatory animus, or indirectly, by demonstrating close temporal proximity between the protected activity and the adverse action." *Zamora v. Open Door Family Med. Ctr., Inc.,* No. 16-cv-00353 (NSR), 2018 U.S. Dist. LEXIS 168241, at *17 (S.D.N.Y. Sep. 28, 2018) (citation omitted).  Harriott has done neither here.  As he concedes, seven months is not sufficiently contemporaneous to constitute indirect evidence.  *See* Doc. 30 at 26–28.  And Harriott's evidence of retaliatory animus is also insufficient.  First, he has offered no evidence that Morales was involved in the decision to transfer him.  He cites Times' affidavit (Doc. 31 ¶ 43), but the affidavit nowhere states that Morales was involved in the decision to transfer him to Queens in May 2020 (*see* Doc. 28).  Harriott's insinuation that Morales engineered the transfer as retaliation for the October 2019 complaint is thus unsubstantiated and insufficient to establish a causal connection.  Further, Harriott's only evidence that Sam was aware of his complaint against Morales and threatened to transfer him is his own uncorroborated deposition testimony that he told Sam about Morales' conduct and Sam threatened to transfer him—which is also contradicted by his testimony later in the same deposition that he did not tell Sam about the complaint against Morales. Doc. 29-1 at 82:16–84:2, 263:6–264:10, 375:17–376:2.  More critically, Harriott offers no evidence whatsoever that Sam had any involvement in the decision to transfer him. Harriott's opposition thus primarily relies on unsupported assertions and conjecture, which is not enough.  *See Goenaga*, 51 F.3d at 18.  Without some evidence that a decisionmaker for the transfer had a retaliatory motive, Harriott cannot show a causal connection between his complaint against Morales and the transfer, particularly given the time that elapsed between the two events.  *See Zamora*, 2018 U.S. Dist. LEXIS 168241, at *17.  Accordingly, this constitutes an independent reason upon which to grant Success Academy's motion for summary judgment on Harriott's retaliation claims.

    *3.   Harriott Has Not Demonstrated that Success Academy's Reasons were Pretextual, Rather than Legitimate and Non-Discriminatory*

Finally, Success Academy argues that, even if Harriott had made out a prima facie case of discrimination, he would still fail at the third step of the *McDonnell Douglas* framework because the decision to transfer Harriott was made for legitimate, non-discriminatory and non-pretextual reasons.  Doc. 20 at 21–22.  Specifically, Battle selected Smith to remain at BSMS instead of Harriott because:  (1) Harriott lived in Queens, while Smith lived closer to BSMS; (2) Harriott had experience building a chess program, making him more suited for the Queens opportunity; and (3) Smith's full-time schedule better fit BSMS' needs.  Doc. 31 ¶ 45.  Harriott does not address this argument at all in his opposition.  *See* Doc. 30.

Once Success Academy articulated an explanation that, if true, would connote lawful behavior, the presumption of discrimination dropped from the case.  *See Texas Dep't of Cmty. Affairs*, 450 U.S. at 255, 255 n.10; *Greenway*, 143 F.3d at 52.  The burden then shifted to Harriott to establish that Success Academy's justifications were pretextual.  *See James*, 2023 U.S. Dist. LEXIS 65415, at *11.  Harriott's failure to advance any arguments responding to Success Academy's legitimate and non-discriminatory reasons necessarily means that he has not satisfied his burden to show that those justifications were pretextual, as required by the third step of the *McDonnell Douglas* framework.  *See id.*  Accordingly, this constitutes an independent reason to grant Success Academy's motion for summary judgment on the retaliation claims.

## IV.    CONCLUSION

For the reasons set forth above, Success Academy's motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion (Doc. 19) and close the case.

It is SO ORDERED.

Dated:    February 23, 2024
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.